**SEALED**

ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

FILED IN OPEN COURT
U.S.D.C. - Atlanta

JAN 2 2 2013

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

| UNITED STATES OF AMERICA | : (UNDER SEAL) |
| --- | --- |
| | : CRIMINAL INDICTMENT |
| v. | : |
| | : **1 13-CR- 25** |
| LARRY WEBMAN, | : |
| RANDY WEBMAN, | : |
| DARA WEBMAN, and | : |
| GEORGE WILLIAMS, M.D. | : |

THE GRAND JURY CHARGES THAT:

**COUNT ONE**
**(Drug Conspiracy)**

**INTRODUCTION**

At all times relevant to this Indictment, unless otherwise specified:

1.  The Controlled Substances Act (CSA) governed the manufacture, distribution, and dispensing of controlled substances in the United States. With limited exceptions for medical professionals, the CSA made it "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense . . . a controlled substance" or conspire to do so.

2.  The CSA and its implementing regulations set forth the drugs and other substances that are defined by law as "controlled substances," and those controlled substances are then assigned to one

of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

3. "Schedule II" means that the drug has a high potential for abuse, the drug has a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions, and abuse of the drug may lead to severe psychological or physical dependence. 21 U.S.C. § 812(b)(2). "Schedule III" means that the drug has a potential for abuse less than the drugs listed in Schedules I and II, the drug has a currently accepted medical use, and abuse of the drug can lead to moderate or low physical dependence or high psychological dependence. 21 U.S.C. § 812(b)(3). "Schedule IV" means that the drug has a low potential for abuse relative to the drugs or other substances in Schedule III, has a currently accepted medical use and abuse of the drug may lead to limited physical dependence or psychological dependence. 21 U.S.C. § 812(b)(4).

4. Pursuant to the CSA and its implementing regulations:

a. Oxycodone, the generic name for a highly addictive prescription painkiller, is classified as a Schedule II controlled substance. 21 C.F.R. § 1308.12(b)(1). Oxycodone is sold generically or under a variety of brand names, including Oxycodone, Oxycontin, Roxicodone, and Percocet.

    b.  Hydromorphone, the generic name for a highly addictive prescription painkiller, is classified as a Schedule II controlled substance. 21 C.F.R. § 1308.12(b)(1). Hydromorphone is sold generically or under the brand name Dilaudid.

    c.  Oxymorphone, a painkiller, is a Schedule II controlled substance. 21 C.F.R. § 1308.12(b)(1). Oxymorphone is sold generically or under the brand name Opana.

    d.  Morphine Sulfate, a painkiller, is a Schedule II controlled substance. 21 C.F.R. § 1308.12(b)(1). Morphine is sold generically or under the brand name MS Contin.

    e.  Alprazolam is classified as a Schedule IV controlled substance. 21 C.F.R. § 1308.14(c)(1). Alprazolam is sold generically or under the brand name Xanax.

    f.  Lorazepam is classified as a Schedule IV controlled substance. 21 C.F.R. § 1308.14(c)(1). Lorazepam is sold generically or under the brand name Ativan.

    g.  Carisoprodol is classified as a Schedule IV controlled substance. 21 C.F.R. § 1308.14(c)(1). Alprazolam is sold generically or under the brand name Soma.

5.  Medical practitioners (such as physicians and pharmacists) who are authorized to prescribe or dispense controlled substances by the jurisdiction in which they are licensed to practice medicine are

authorized under the CSA to write prescriptions for, or otherwise dispense, controlled substances if they are registered with the Attorney General of the United States. 21 U.S.C. § 822(b); 21 C.F.R. § 290.1. Upon application by the practitioner, the Drug Enforcement Administration (DEA) assigns a unique registration number to each such qualifying practitioner.

6. Under Chapter 21 of the Code of Federal Regulations, Section 1306.04(a), medical practitioners registered with the DEA cannot issue a prescription for a controlled substance unless it is "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice . . . The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research [is] not a prescription within the meaning and intent of [the CSA] and the person knowingly filling such a purported prescription, as well as the person issuing it, [is] subject to the penalties provided for violations of the provisions of law relating to controlled substances."

7. An order purporting to be a prescription that was not issued for a legitimate medical purpose in the usual course of professional medical practice was not a prescription within the

-4-

meaning of the CSA, and the person who issued the prescription violated Section 841(a)(1).

**DEFENDANTS**

8.  Defendants LARRY WEBMAN and RANDY WEBMAN, through one or more controlled entities, beginning no later than sometime in or about February 2012, opened and have operated an alleged medical clinic, known variously as Premier Medical Management Inc., Premier Pain Management Inc., Premier Pain Management, and Premier Pain Management and Physical Therapy (PMMI), located at 3993 Lawrenceville Highway, Suite 110, in the City of Lilburn, in Gwinnett County, Georgia.

9.  As the principal owners of PMMI, LARRY WEBMAN and RANDY WEBMAN managed, controlled, and supervised the day-to-day operations of PMMI, including renting the premises where PMMI is located. Neither LARRY WEBMAN nor RANDY WEBMAN is a medical professional licensed in any capacity in Georgia.

10. Defendant DARA WEBMAN is the daughter of RANDY WEBMAN. DARA WEBMAN is the Office Manager at PMMI. DARA WEBMAN is not a medical professional licensed in any capacity in Georgia.

11. Defendant GEORGE WILLIAMS, M.D. (DR. WILLIAMS), is an obstetrician-gynecologist who works as a prescribing physician at PMMI. He holds an active State of Georgia Physician License, License

No. 55039, which authorizes him to practice medicine in Georgia. DR. WILLIAMS also holds a DEA registration, Registration No. BW8865620, which authorizes him to dispense, administer, and prescribe controlled substances in Schedules II through V, but only in the usual course of professional medical practice and for legitimate medical purposes.

### THE AGREEMENT

12. Beginning on a date unknown to the Grand Jury, but no later than sometime in or about February 2012, and continuing to the date hereof, within the Northern District of Georgia, and elsewhere, the defendants,

> LARRY WEBMAN,
> RANDY WEBMAN,
> DARA WEBMAN, and
> DR. GEORGE WILLIAMS,

did knowingly and willfully combine, conspire, confederate, agree, and have a tacit understanding with each other and others known and unknown to the Grand Jury, to knowingly and intentionally distribute and dispense, outside the usual course of professional medical practice and for no legitimate medical purpose, mixtures and substances containing detectable amounts of various controlled substances, including, but not limited to, Oxycodone (Schedule II), Hydromorphone (Schedule II), Oxymorphone (Schedule II), Morphine Sulfate (Schedule II), Alprazolam (Schedule IV), Lorazepam (Schedule

IV), and Carisoprodol (Schedule IV), in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and (b)(2).

### NATURE AND PURPOSE OF THE DRUG CONSPIRACY

The purposes of the conspiracy included, but were not limited to, the following:

13. To attract large numbers of persons interested in obtaining prescriptions for controlled substances, and to issue prescriptions to such persons without regard to whether there was a legitimate medical purpose for the prescriptions, in order to generate large cash proceeds.

14. To satisfy the demand for the illegal distribution, sale, and consumption of controlled substances, including, but not limited to Oxycodone, Hydromorphone, Oxymorphone, Morphine Sulfate, Alprazolam, Lorazepam, and Carisoprodol, in the areas of northern Georgia, Kentucky, Tennessee, North Carolina, South Carolina, Florida, and elsewhere.

### MANNER AND MEANS OF THE DRUG CONSPIRACY

The manner and means of the conspiracy included the following:

15. It was part of the conspiracy that LARRY and RANDY WEBMAN would and did knowingly open, use, operate and maintain PMMI for the purpose of unlawfully distributing and causing the unlawful distribution of controlled substances, including Oxycodone,

Hydromorphone, Oxymorphone, Morphine Sulfate, Alprazolam, Lorazepam, and Carisoprodol.

16.   It was part of the conspiracy that the defendants would and did knowingly and intentionally distribute and cause, aid, abet, and facilitate the distribution of controlled substances at PMMI, not in the usual course of professional medical practice and not for a legitimate medical purpose, in one or more of the following manners:

      a.   Without adequate verification of the customer's medical complaint;

      b.   Without adequate and reliable customer medical history to verify the accuracy of the customer's statements to the physician;

      c.   Without performance of a complete or adequate physical or neurological examination;

      d.   Without establishment of a true diagnosis;

      e.   Without the use of appropriate diagnostic or laboratory testing;

      f.   Without sufficient dialogue with the customer regarding treatment options (such as physical therapy or surgery), and risks and benefits of such treatments;

      g.   Without establishing a treatment plan;

      h.   Without consideration of or discussion with the customer regarding alternatives to treatment other than controlled substances;

      i.    Without referral of customers to specialists in an effort to identify and correct the customer's alleged pain, or treat the customer for psychological dysfunctions by, for example, addiction counseling;

      j.    Without any assessment of an individual customer's risk of abuse of Schedule II, III, and IV narcotic drugs; and

      k.    Without provision of a means to monitor the customer's response to the medications.

17. It was part of the conspiracy that the defendants would and did require a customer to pay between $250 and $350 in cash each time the customer visited the clinic for a prescription for controlled substances, allegedly as fees for the "office visit".

18. It was part of the conspiracy that a single physician working at PMMI would and did routinely see between 40 and 60 customers a day. As a result, customers waited significant periods of time (sometimes up to eight hours) to obtain prescriptions for controlled substances. During the course and in furtherance of the conspiracy, the defendants did not adhere to an appointment schedule, often admitting customers out of turn on their appointment day. This caused customers to park at the clinic's entrance areas early in the morning before the clinic opened.

19. During the course and in furtherance of the conspiracy, many customers traveled long distances (including from Kentucky,

Tennessee, North Carolina, South Carolina, and Florida) to obtain prescriptions for controlled substances from PMMI.

20. During the course and in furtherance of the conspiracy, DR. WILLIAMS, at the direction, and with the knowledge, of LARRY WEBMAN and RANDY WEBMAN, prescribed controlled substances after performing inadequate medical evaluations of the customer and continued to write additional, or replacement, prescriptions without any, or extremely limited, further medical evaluations, or with limited medical evaluation. It was further part of the conspiracy that DR. WILLIAMS, at the direction, and with the knowledge, of LARRY WEBMAN and RANDY WEBMAN, routinely issued replacement prescriptions for controlled substances without seeing the customer in person.

21. During the course and in furtherance of the conspiracy, DARA WEBMAN, at the direction, and with the knowledge, of LARRY WEBMAN and RANDY WEBMAN, handed out prescriptions for controlled substances signed by DR. WILLIAMS in exchange for cash payments from customers, many of whom had not been seen in person by DR. WILLIAMS for several months.

22. During the course and in furtherance of the conspiracy, LARRY WEBMAN and RANDY WEBMAN directed that PMMI operate according to an intake protocol (including requiring that a customer provide a magnetic resonance imaging (MRI) scan and prescription profile before

being prescribed controlled substances) that was designed to ensure that the clinic did not attract the attention of law enforcement.

23. During the course and in furtherance of the conspiracy, the defendants knowingly caused, or had a reasonable expectation of causing, an addiction to controlled substances in customers, which addiction would, in turn, compel these customers to return to PMMI for additional prescriptions, thereby insuring additional revenue for PMMI. It was part of the conspiracy that DR. WILLIAMS continued prescribing excessive amounts of controlled substances after ignoring obvious indications that customers were abusing, misusing, and distributing the prescribed drugs. Such indications included the large cash outlay required for the office visits and purchasing the prescribed controlled substances.

24. During the course and in furtherance of the conspiracy, the defendants accepted groups of new customers who were brought to PMMI by "sponsors." These sponsors paid for office visits and MRI scans of their "recruits". After the recruits received prescriptions for controlled substances signed by DR. WILLIAMS, the sponsors paid to have the prescriptions filled and then sold the dispensed controlled substances.

25. During the course and in furtherance of the conspiracy, LARRY WEBMAN and RANDY WEBMAN hired armed security guards to monitor the customers at the clinics. The security guards directed customers

to wait outside in their cars to avoid attracting the attention of law enforcement.

26. During the course and in furtherance of the conspiracy, several local pharmacies refused to honor any prescriptions written by DR. WILLIAMS due to the large quantities and medically inappropriate dosages of controlled substances he was prescribing.

27. During the course and in furtherance of the conspiracy, LARRY WEBMAN and RANDY WEBMAN, and others, collected significant amounts of cash generated from the business at PMMI on a daily basis, and routinely made large cash deposits at one or more banks in the Atlanta area.

All in violation of Title 21, United States Code, Section 846.

## COUNTS TWO THROUGH FIVE
### (Unlawful Drug Distribution)

28. Paragraphs One through Eleven are re-alleged and incorporated into each of Counts Two through Five of this Indictment.

29. On or about the dates set forth below, within the Northern District of Georgia, and elsewhere, the defendants,

> LARRY WEBMAN,
> RANDY WEBMAN,
> DARA WEBMAN, and
> DR. GEORGE WILLIAMS,

as described below, did knowingly and intentionally distribute and dispense, and aid and abet the distribution and dispensing of,

-12-

tablets, pills, and syrup, which were mixtures and substances containing the controlled substances listed below, by causing prescriptions to be issued for the controlled substances, outside the course of professional medical practice and for other than a legitimate medical purpose, each prescription constituting a separate count of this Indictment:

| Count | Date | Controlled Substance |
|---|---|---|
| 2 | 10/04/2012 | 112 tablets Hydromorphone 4mg, Schedule II<br>30 tablets Oxycontin 20mg, Schedule II<br>60 tablets Carisoprodol 350mg, Schedule IV |
| 3 | 11/02/2012 | 75 tablets Hydromorphone 8mg, Schedule II<br>60 tablets MS Contin 30mg, Schedule II<br>56 tablets Alprazolam 2mg, Schedule IV |
| 4 | 11/02/2012 | 56 tablets Hydromorphone 8mg, Schedule II<br>120 tablets Morphine Sulfate 30mg, Schedule II<br>60 tablets Oxymorphone 40mg, Schedule II<br>60 tablets Alprazolam 2mg, Schedule IV |
| 5 | 11/02/2012 | 112 tablets Hydromorphone 4mg, Schedule II<br>30 tablets Oxycontin 20mg, Schedule II<br>60 tablets Carisoprodol 350mg, Schedule IV |

All in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and (b)(2), and Title 18, United States Code, Section 2.

## COUNT SIX
### (Unlawful Drug Distribution Near a School)

30. Paragraphs One through Eleven, and Twenty Nine are re-alleged and incorporated into Count Six of this Indictment.

31. As set forth in paragraph Twenty Nine, the defendants,

> LARRY WEBMAN,
> RANDY WEBMAN,
> DARA WEBMAN, and
> DR. GEORGE WILLIAMS,

did knowingly and intentionally distribute and dispense, and aid and abet the distribution and dispensing of, tablets, pills, and syrup, which were mixtures and substances containing controlled substances, by causing prescriptions to be issued for the controlled substances, outside the course of professional medical practice and for other than a legitimate medical purpose, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and (b)(2), all within 1000 feet of the real property comprising the Berkmar High School, located at 405 Pleasant Hill Road, in the City of Lilburn, in Gwinnett County, Georgia, a public high school.

All in violation of Title 21, United States Code, Section 860(a)(1), and Title 18, United States Code, Section 2.

## COUNT SEVEN
### (Maintaining a Place for Unlawful Drug Distribution)

32. Paragraphs One through Nine are re-alleged and incorporated into Count Seven of this Indictment.

-14-

33. Beginning on a date unknown to the Grand Jury, but no later than sometime in or about February 2012, and continuing to the date hereof, in the Northern District of Georgia, the defendants,

LARRY WEBMAN, and
RANDY WEBMAN,

did knowingly, intentionally, and without legal authorization open, lease, rent, use or maintain a place, namely PMMI, located at 3993 Lawrenceville Highway, Suite 110, in the City of Lilburn, in Gwinnett County, Georgia, and attempt to do so, for the purpose of distributing controlled substances, outside the course of professional medical practice and for other than a legitimate medical purpose, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and (b)(2).

All in violation of Title 21, United States Code, Section 856(a)(1), and Title 18, United States Code, Section 2.

**FORFEITURE PROVISION**

Upon conviction of one or more of the controlled substance offenses alleged in Counts One through Five, and Count Seven of this Indictment, the defendants shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853, all property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of the said violations and all property used or intended to be used, in any manner or part, to commit, or to

facilitate the commission of the said violations, including but not limited to the following:

a.   MONEY JUDGMENT:  A sum of money in United States currency representing the amount of proceeds obtained as a result of each offense, or conspiracy to commit such offense, for which the defendant is convicted.  If more than one defendant is convicted of an offense, the defendants so convicted are jointly and severally liable.

b.   PROFESSIONAL LICENSES:
   1.   State of Georgia Physician License No. 55039 held in the name of George Allen Williams, M.D.

If, as a result of any act or omission of the defendants, any property subject to forfeiture:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third person;

c.   has been placed beyond the jurisdiction of the Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be subdivided without difficulty;

the United States intends, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

A _____*true*_____ BILL

_____*[signature]*_____
FOREPERSON

SALLY QUILLIAN YATES
UNITED STATES ATTORNEY


*[signature]*

AJAY GUPTA
SPECIAL ASSISTANT UNITED STATES ATTORNEY
75 Spring Street SW, Suite 600
Atlanta, Georgia 30303
(404) 581-6285
Provisionally admitted